**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LESLEY J. PELKA,** | ) | |
| | ) | **No. 11 CV 809** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner,** | ) | |
| **Social Security Administration,** | ) | |
| | ) | **February 6, 2013** |
| **Defendant.** | ) | |

**MEMORANDUM OPINION and ORDER**

Lesley J. Pelka applied for a period of disability and disability insurance benefits

("DIB") in 2008 alleging disability due to a combination of physical impairments, including

injury to her right knee, a repaired detached retina, high blood pressure, Ehlers-Danlos

syndrome, and obesity.  Her application was denied by the Commissioner of the Social

Security Administration ("Commissioner") and again by an administrative law judge

("ALJ").  Pelka challenges the ALJ's decision in the current motion for summary judgment.

For the following reasons, Pelka's motion is denied and the Commissioner's motion for

summary judgment is granted:

**Procedural History**

Pelka applied for DIB on February 29, 2008, alleging disability beginning on June 2,

2007.  (Administrative Record ("A.R.") 98-100.)  The Commissioner denied her claims

initially and on reconsideration. (Id. at 49-50.) Following a hearing in September 2009, the

presiding ALJ found Pelka to have numerous severe impairments—"degenerative joint

disease of the right knee[;] status post arthroscopic surgical repair of knee; Ehlers-Danlos syndrome; degenerative joint disease of the right wrist; obesity[;] and a history of detached retina of the right eye, status post surgical repair"—but found that she was capable of performing sedentary work with some limitations and was capable of adjusting to work that existed in the national economy through the last date of her insured status. (Id. at 9-14.) The Appeals Council denied Pelka's request for review (id. at 1-3), making the ALJ's decision the final decision of the Commissioner, *see* 20 C.F.R. §§ 404.955, 404.981; *see also Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). Pelka then filed the current suit seeking judicial review of the ALJ's decision. *See* 42 U.S.C. § 405(g). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c). (R. 16.)

## Facts

Pelka was 44 years old when she applied for benefits, (A.R. 20, 98), and 45 years old when her insured status expired, (id. at 9, 20). She has a master's degree in education curriculum. (Id. at 20, 26.) She worked as an office manager and a substitute teacher before she injured her knee in June 2007. (Id. at 21, 42.) She claims that she has been unable to work since that injury. (Id. at 21.) She officiated two swim meets after the injury but was not able to perform all of the functions the job required. (Id. at 25.) She also suffers from a right wrist injury from 2001, a detached retina that was surgically repaired in 2002, and obesity. (Id. at 22.)

**A.      Medical Evidence**

Pelka sought medical treatment on June 2, 2007, following a slip and fall on her deck. (Id. at. 226.)  She complained of doing "the splits" and landing on her right knee and left buttock when she fell.  (Id. at 226-28.)  The hospital staff prescribed Valium and Darvocet, instructed her to elevate the knee, wear an immobilizer, use crutches, and follow-up with an orthopedist.  (Id. at 228-30.)  Three days later, Pelka visited Dr. Michael Terry of the University of Chicago Physicians Group.  (Id. at 301-02.)  Dr. Terry noted Pelka's history of three previous right knee surgeries and a right wrist surgery.  (Id. at 301.)  Based on his review of radiological films, he concluded that Pelka's knee showed an avulsion fracture of the lateral distal tibial plateau.  (Id.)  When Pelka returned to Dr. Terry several days later on June 12, 2007, for a magnetic resonance imaging ("MRI") scan review, Dr. Terry opined that Pelka's right knee showed a possible detachment of a lateral osteophyte from the tibial plateau and degenerative joint disease, but no apparent structural deficiencies.  (Id. at 298.) Dr. Terry suggested that Pelka advance her weight bearing on the knee as tolerated using crutches and return in three weeks.  (Id.)  At Pelka's follow-up visit, Dr. Terry recommended arthroscopic surgery to remove the osteophyte.  (Id. at 296.)

Pelka underwent the surgery in July 2007.  (Id. at 239.)  Dr. Terry found degenerative changes in the knee, adhesions, and a loose body, which he removed.  (Id. at 239-40.)  He debrided the frayed aspect of the meniscus and took down the adhesions to allow "much more appropriate tracking of the patella."  (Id. at 240.)  Pelka then participated in physical therapy for about four months through November 2007.  (Id. at 248-57.)  Her physical

therapist's notes from October 2007 recorded Pelka's comment that she believed herself to be capable of walking one mile on level ground without complaints of pain or discomfort. (Id. at 250.)  In November, her therapist commented that "Ms. Pelka reports that she is 85% better since initiating physical therapy. . . .  Patient reports ongoing difficulty with . . . [w]alking greater than a mile, reaching overhead, squatting to clean the bathroom."  (Id. at 248.)

Pelka returned to Dr. Terry on November 27, 2007, complaining of locking and clicking in her knee.  (Id. at 288.)  Dr. Terry ordered another MRI, which he summarized as showing degenerative changes throughout most of her knee without any discreet meniscus tears.  (Id. at 286, 288.)  The radiologist's impressions included "[n]ear complete loss of substance of the lateral meniscus . . . [m]oderate diffuse irregular thinning of lateral compartment articular cartilage which is less than expected for such an extensive meniscal tear[,] and meniscal changes probably reflect primarily surgical alteration."  (Id. at 244.) Dr. Terry recommended a steroid injection, which Pelka tolerated well on December 4, 2007. (Id. at 286.)  When Pelka returned two months later on January 29, 2008, she stated that "she was doing well for a while and then her pain returned."  (Id. at 284.)  Dr. Terry ordered another injection, which he noted gave "almost immediate relief of the symptoms."  (Id.)

Pelka's medical records also contain two evaluations by Dr. William Elliot, an internist working at a hypertension center.  (Id. at 265-68.)  The first evaluation, dated October 31, 2007, notes her weight of 212 pounds, height of 65 inches, and body mass index of 35.3.  (Id. at 267.)  Dr. Elliot commented that Pelka's supine blood pressure of 129/94 and

standing blood pressures of 145/97 and 143/98 were higher than her goal. (Id. at 267-68.) He started her on Amlodipine. (Id. at 268.) When she returned in February 2008, Dr. Elliot noted that the Amlodipine had "done a marvelous job of controlling her BP, with no side effects." (Id. at 265.) During that visit, "at least one of Ms. Pelka's blood pressures [was] lower than her goal, which is less than 140/90." (Id.)

Pelka submitted to a consultative examination by Dr. Roopa Karri, in May 2008 at the request of the state disability agency. (Id. at 307-12.) Dr. Karri noted that Pelka is obese at a height of 5'4" inches and a weight of 198 pounds. (Id. at 309.) During the examination, Pelka was able to get on and off the exam table and was able to walk 50 feet without support. (Id. at 310.) Her gait was "non-antalgic without the use of assistive devices." (Id.) Dr. Karri observed that Pelka's vision with contact lenses was 20/40 in the right eye and 20/25 in the left. (Id. at 309.) Dr. Karri noted five problems: (1) history of right knee pain, with degenerative arthritis with hyper-extension and hyper-flexibility; (2) hypertension; (3) history of Ehlers-Danlos syndrome with hyper-flexibility; (4) right wrist pain with mildly decreased range of motion; and (5) morbid obesity. (Id. at 310-11.)

The following month, Dr. Frank Jimenez, a state agency doctor, reviewed Pelka's medical records and assessed her residual functional capacity ("RFC"). (Id. at 313-20.) He diagnosed her with degenerative joint disease and hypertension, and noted hyperflexibility as an additional alleged impairment. (Id. at 313.) Dr. Jimenez summarized Dr. Elliott's findings, including his comment that Pelka's blood pressure was controlled with medication. (Id. at 314.) He also noted that Pelka ambulates unassisted. (Id. at 315.) He credited all the

5

medical evidence in Pelka's file. (Id. at 320.) Dr. Jimenez considered Pelka's ability to do light housework and shopping and opined that the objective examination findings did not substantiate her claims of limitation. (Id.) Dr. Jimenez found that Pelka could lift up to 20 pounds occasionally and 10 pounds frequently; stand and walk about 6 hours; sit about 6 hours; and push and pull to an unlimited degree. (Id. at 314.)

The state agency sent Pelka to Dr. Constantine Wonais for another consultative examination in September 2008. (Id. at 322-24.) At that appointment, Pelka told Dr. Wonais that she could stand still for only 10-15 minutes because of pain in her right knee. (Id. at 323.) She also mentioned that she could walk for about 30 minutes at a time. (Id.) Dr. Wonais observed Pelka walking unaided with a normal gait. (Id.) Pelka also was able to walk on her heels and toes at the appointment, though doing so resulted in pain in her left heel. (Id. at 324.) She told him that she avoids climbing stairs. (Id. at 323.) He found Pelka's range of motion to be normal with hyperflexibility in most joints. (Id. at 324.) She was able to get up from a sitting position without any difficulty. (Id.) Her grip "strength and digital dexterity were unimpaired." (Id.) Her blood pressured was 138/80. (Id. at 323.) Dr. Wonais noted her height of 5'5" and her weight of 208 pounds. (Id.) Her visual acuity was 20/40 in the right and 20/30 in the left with contact lenses. (Id.) Dr. Wonais noted four impressions: (1) hypertension; (2) Ehlers-Danlos syndrome; (3) degenerative changes in the right knee secondary to four surgeries; and (4) plantar fasciitis. (Id. at 324.) The state agency furnished Dr. Wonais's report to Dr. Charles Kenney, who relied on it in reconsidering Pelka's RFC. (Id. at 325-27.) Dr. Kenney concluded that Pelka is capable of

light work. (Id. at 327.) Central to his finding was Pelka's "full range of motion in all joints" and her ability to "ambulate without an assistant [sic] device." (Id.)

## B.     Pelka's Testimony

At the hearing before the ALJ, Pelka testified that she has a master's degree in education curriculum. (A.R. 20.) Her first job after graduation was in a family business, where she worked as an office manager. (Id. at 27.) She also worked as a substitute teacher. (Id. at 42.) More recently, from May 2005 through June 2007, she managed the office of a landscape company. (Id. at 21.) In that role, she was responsible for hiring and firing employees, managing about 60 trucks, filing, and all other office duties. (Id. at 26.) She also used a computer to draw up estimates and contracts. (Id.) She stopped working at the landscape company after her injury. (Id. at 26.) After she exhausted her flex days and sick days, the company told her not to return to work. (Id.)

Pelka injured her knee when she fell on her deck. (Id. at 21.) She testified that the fall caused a piece of bone to break off the right knee and it also tore the cartilage in that knee. (Id.) She had knee surgery in July 2007 and was on crutches and in a wheelchair through the end of August into September 2007. (Id.) She continues to struggle with walking, standing or sitting for very long. (Id. at 21-22.) She can stand for about 10 minutes but then has to sit down because of a knife-like pain that rises from the lower part of the right knee. (Id. at 29.) Pelka described her knee pain as chronic, excruciating, and an eight on a scale of one to ten, with ten being a pain meriting a visit to the emergency room. (Id. at 31-32.) She can walk on a flat surface for about five minutes, but then she has to rest, flex her

leg, and sometimes she needs to sit. (Id. at 29.) She cannot walk on uneven surfaces. (Id.) Sometimes Pelka falls when her knee "lock[s] up." (Id. at 31.) She uses a cane or crutches on occasion, like after her knee "blew out" after she bent down to pick up a pair of glasses off of a bed. (Id. at 27, 31.) She can sit for about 10-15 minutes, though with discomfort. (Id. at 29-30.) When she sits, she usually elevates her right leg and supports her knee. (Id. at 36.) She can lift about 10 pounds. (Id. at 30.) She descends the stairs in her house only about once a day, and when she ascends, she often does so by sitting on the bottom step and pushing herself up. (Id.)

In addition to the knee injury, Pelka suffers from other ailments, including obesity. She is about 5'5" tall and weighs 200 pounds. (Id. at 20.) She injured her right wrist in 2001 and now struggles with writing, typing, and lifting with her right hand. (Id. at 22.) Sometimes, her right wrist swells. (Id. at 33.) In 2002, the retina in her right eye detached. (Id. at 22, 32.) Though it was successfully repaired through surgery, Pelka experiences pressure behind the eye when she watches television, uses a computer monitor, or is in an environment with bright lights. (Id. at 22.) She also suffers from fatigue and high blood pressure. (Id.) She takes medications for her blood pressure, allergies, and adult acne, and for her knee. (Id. at 33-34.) She also uses a nitroglycerin patch for her left foot to heal the plantar fasciitis that she developed from being on crutches following her right knee injury. (Id. at 34.)

After she lost her job, Pelka collected federal unemployment compensation for 18 months, followed by another period of renewed federal unemployment compensation. (Id.

at 23.)  At the time of the hearing, she was collecting benefits from the State of Illinois unemployment compensation program.  (Id.)  While collecting the federal and state benefits, Pelka was required to look for work, so she tried to find temporary jobs that allow her to sit and stand.  (Id.)  She officiated two NCAA swim meets since she injured her knee.  (Id. at 24.) When officiating, Pelka stood up to start the meet but then observed the swimmers from a chair.  (Id. at 25.)  Ordinarily an official would walk back and forth on the pool deck to watch the swimmers turn, but Pelka felt that the deck was too slippery for her to do so.  (Id.)

Pelka manages her personal grooming and some chores at home, like dusting areas that do not require her to reach up or down.  (Id. at 23-24, 27.)   She also makes "light dinners."  (Id.)  When shopping for groceries, she uses a motorized cart or walks with a shopping cart. (Id. at 28.)  She uses the computer for personal banking.  (Id.)  She testified that she usually starts her day by watching television and often watches more television after making dinner,  but it is difficult for her to watch television in the evening and she seldom reads.  (Id. at 29-30.)  Her eye pain, which she described as pressure, is aggravated by brightness, reading, and staring at a computer monitor or television.  (Id. at 32.)  When at home, if she is not getting dressed or making dinner, then she is sitting with her right leg elevated and supported.  (Id. at 36-37.)  Pelka testified that on her "best day," she might be able to work on a computer for six to eight hours, but only if she were permitted to sit and stand as needed, and if she elevated her leg under her desk.  (Id. at 38.)  But she was concerned that six to eight hours of work would be too hard on her right eye, and she doubted that she would be able to return to work the following day.  (Id. at 38-39.)  She operates at

her best capacity about two days per week.  (Id. at 39.)

**C.    Vocational Expert's Testimony**

Frank Mendrick, a vocational expert ("VE"),  testified before the ALJ.  (Id. at 40-47.) He classified Pelka's former work as follows: substitute teaching was sedentary, skilled work; office managing was skilled, multi-faceted work, performed at a medium capacity; and sports officiating was skilled, light work, both as performed by Pelka and generally in the economy.  (Id. at 42.)

The ALJ posed four hypothetical questions to the VE.  First, he asked the VE to consider an individual under 50 years of age, with Pelka's education, work experience, and skill set, who is able to lift up to 10 pounds occasionally and perform sedentary work as defined by regulations, but is not able to climb ladders, kneel, crouch, or crawl, who cannot be exposed to concentration of bright lights and poorly ventilated areas or unprotected heights, is limited to only occasional climbing of ramps or stairs, occasional balancing, stooping, and crouching, and is capable of occasionally reaching overhead and frequently handling objects.  (Id. at 42-43.)  The VE opined that this individual would not be able to perform Pelka's past work but would be capable of sedentary work like simple small products assembly, inspection of electrical or electric parts, and hand labor.  (Id. at 43.)  The ALJ added one restriction for the second hypothetical: the individual needed the option to sit or stand alternatively at will, but would not be taken off task more than 10 percent of the time.  (Id. at 44.)  The VE opined that this limitation would not preclude the employment options he provided for the first hypothetical.  (Id.)  The ALJ then added the following

limitation: the individual needed an occupation "allowing less than frequent near acuity." The VE opined that even with this additional limitation, the hypothetical individual would be capable of simple small products assembly, inspection of electrical or electric parts, and hand laborer positions. (Id.) Lastly, the ALJ asked the VE to consider an individual who is unable to engage in sustained work activity on a regular, continuing basis for eight hours a day, five days a week, for a 40-hour work week or the equivalent. (Id. at 45.) The VE testified that the full-time work he had discussed would not be available to an individual who needed to exceed customary breaks on a regular basis. (Id.) Additionally, in response to questions from Pelka's attorney, the VE opined that neither a factory setting nor an office setting would be conducive to a worker needing to elevate her leg above the height of the seat of a standard chair—in a factory setting, it would be impossible to elevate the leg that high, and in an office setting, the worker would be forced to sit too far back from the work station to be able to perform the job. (Id. at 46-47.) The VE confirmed that an individual who needed to elevate her leg above a chair's seat would not be capable of the sedentary jobs of small products assembly, inspection of electrical or electric parts, or hand laborer. (Id.)

## D.  The ALJ's Decision

In evaluating Pelka's claim, the ALJ applied the standard five-step sequential inquiry for determining disability, which required him to analyze whether:

> (1) the claimant has engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the claimant's severe impairment meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) the claimant can perform her past work; and (5) the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)). If the ALJ finds at step three that the claimant has a severe impairment that does not equal one of the listed impairments, he must "assess and make a finding about [the claimant's RFC] based on all the relevant medical and other evidence" before moving on to step four. 20 C.F.R. § 404.1520(e). A claimant's RFC is the "most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ then uses the RFC to determine at steps four and five whether the claimant can return to her past work or different available work in the national economy. 20 C.F.R. § 404.1520(e)-(g). The claimant bears the burden of proof at steps one through four, but if the claimant meets that burden, the burden shifts to the Commissioner at step five. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). There, the Commissioner must demonstrate that the claimant—in light of her age, education, job experience and RFC to work—is capable of performing other work and that such work exists in the national economy. 20 C.F.R. § 404.1520(g).

Here, the ALJ concluded that Pelka is not disabled under the Social Security Act, 42 U.S.C. § 423. (A.R. 7-14.) At step one, the ALJ found that Pelka did not engage in substantial gainful activity between June 2, 2007, her onset date, and September 30, 2008, her date of last insured. (Id. at 9.) At step two, the ALJ determined that Pelka had the following severe impairments: "degenerative joint disease of the right knee[;] status post arthroscopic surgical repair of knee; Ehlers-Danlos syndrome; degenerative joint disease of the right wrist; obesity[;] and a history of a detached retina of the right eye, status post surgical repair." (Id.) At step three, the ALJ concluded that none of these impairments,

alone or in combination, met or medically equaled one of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  (Id. at 9.)  The ALJ discussed Listing 1.02, entitled "Major dysfunction of a joint(s)," and determined that Pelka could not meet that Listing's requirement of an "inability to ambulate effectively," as that term is defined by Section 1.00(B)(2)(b), because she walks without assistance.  (Id. at 9-10, citing 20 C.F.R. § 404, Subpt. P, App. 1 § 1.00(B)(2)(b)(2).)  Before moving to step four, the ALJ determined Pelka's RFC, as of the date of last insured, as the capacity for sedentary work with a sit-stand option with the following limitations: no kneeling, crawling, or climbing ladders, ropes, or scaffolds; only occasional climbing of ramps or stairs, balancing, stooping, and crouching and reaching overhead; frequent handling and fingering of objects; and no concentrated exposure to bright lights, poorly ventilated areas or unprotected heights.  (Id. at 10.)  The RFC finding further limited Pelka to occupations "which could be performed with less than frequent near visual acuity."  (Id.)  At step four, the ALJ concluded that Pelka was no longer able to work as an elementary school teacher, a job that she had performed at the medium and skilled level.[1]  (Id. at 13.)  At step five, the ALJ considered Pelka's age, education, work experience, and RFC, and determined that as of the date of last insured, she was capable of working as a small parts assembler, inspector of electrical parts, and hand laborer, which are occupations that exist in significant numbers in the regional economy.  (Id. at 14.)

_____

[1] The ALJ did not refer to Pelka's prior work as an office manager at step four but this absence is not significant here because VE opined that Pelka had performed the office manager job also at the medium level.  (A.R. 42.)

**Analysis**

Pelka challenges the ALJ's step-three listing analysis, his adverse credibility finding, and the RFC assessment. This court reviews the ALJ's decision to ensure that it is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This standard of review precludes the court from "reweigh[ing] the evidence, resolv[ing] conflicts, decid[ing] questions of credibility, or substitut[ing] [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). But the court must remand the case if the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002), or fails to "provide an accurate and logical bridge between the evidence and the conclusion that the claimant is not disabled," *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (internal quotation omitted).

The court turns first to the ALJ's credibility determination because Pelka's arguments about the listing analysis and RFC determination rely in part on her testimony, which the ALJ rejected as not credible. The ALJ's credibility assessment is entitled to substantial deference and will not be disturbed unless patently wrong. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006).

14

Here, the ALJ began the discussion of Pelka's credibility with an elongated version of the "template" that the Seventh Circuit characterized as "meaningless boilerplate" in *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010):

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(A.R. 10-11.) This template is "opaque," *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012), and is "seen frequently in decisions from ALJs" despite criticisms that it precludes meaningful review. *See Shauger v. Astrue,* 675 F.3d 690, 696 (7th Cir. 2012).

While the ALJ's credibility determination is suspect because of the oft-criticized credibility template, the Seventh Circuit has not yet held that the template is cause for an automatic remand. Rather, inclusion of the template can be harmless error if the ALJ has "otherwise explained his conclusion adequately" and has offered "reasons grounded in the evidence" for discounting the claimant's testimony. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). In this case, the ALJ specified that it was Pelka's statements about her pain and her limitations that he questioned and he provided well-supported reasons for his conclusion. First, he questioned Pelka's testimony about her pain because it contradicted Dr. Terry's treatment notes, which characterize Pelka's pain as relenting, and Pelka's statements to him that the steroids relieved her occasional pains. (A.R. 11-12, 284, 286.) Second, the ALJ found Pelka's description of her debilitating pain to be in conflict with Dr. Terry's

recommendation for conservative treatment. (Id. at 12.) Third, the ALJ disbelieved Pelka's statements about her limited capacity for sitting because it was not reflected in her treating physician's opinion. (Id.) Fourth, the ALJ suggested that Pelka's reported light housework, shopping, and officiating at two NCAA swim meets were inconsistent with her claims of being unable to work. (Id. at 12.) He also considered her demeanor during the hearing, which he characterized as "without . . . any overt pain behavior." (Id.) The ALJ's "personal observations" are permitted by the Commissioner's regulations "in the overall evaluation of the credibility of the individual's statements." SSR 96-7p, 1996 WL 374186 at *8.

In addition to doubting Pelka's claims of pain and limitation, the ALJ also questioned Pelka's credibility because she collected unemployment compensation during the claimed disability period. (A.R. 12.) The Seventh Circuit has held that "a claimant's representations in seeking unemployment benefits may be relevant in assessing the credibility of her representations to the SSA," but if a claimant seeks unemployment benefits because she has no other source of income, collection of the benefits "does not necessarily mean she is not disabled." *Richards v. Astrue*, 370 F. App'x. 727, 732 (7th Cir. 2010) (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005)). The ALJ wrote that to "maintain unemployment benefits, an individual is certifying that she is ready, willing, and able to work and that she is actively looking for work. This raises the question of whether or not [Pelka] has been fully candid with both the State and the Social Security Administration." (A.R. 12.)

Pelka argues that the ALJ cannot impugn her testimony on this basis without citing to any legal authority for his claim that an individual who collects unemployment

16

compensation must certify that she is able to work. But she does not argue that she sought unemployment benefits out of financial desperation or offer any other explanation for seeking unemployment benefits during the period of her claimed disability. Nor does she argue that she did not certify, as part of her application for unemployment compensation, that she was able to work and would search for employment. The ALJ found her testimony on this point to be inconsistent. (Id.) Pelka testified that she sought "temporary jobs that I can sit, and stand and do things" as part of her collection of unemployment compensation. (Id. at 23.) But she also testified that she had not looked for work since separation from her office manager job. (Id. at 21.) This court agrees with the ALJ's finding that Pelka's statements are inconsistent, and even contradictory—either she has not looked for work, as she initially testified, or she has looked for work. The ALJ is entitled to consider "efforts to work" and "whether there are any inconsistencies in the evidence" when evaluating symptoms and pain, *see* 20 C.F.R. §§ 404.1529(a), (c)(4), and his questioning of Pelka's credibility on this ground, in addition to the others discussed above, is not patently wrong.

This court turns now to Pelka's challenge to the ALJ's step-three determination, which she claims is not supported by substantial evidence. At step three of the sequential analysis, "evidence demonstrating the claimant's impairments is compared to a list of impairments presumed severe enough to preclude any gainful work." *Rice v. Barnhart*, 384 F.3d 363, 365 (7th Cir. 2004.) Here, the ALJ considered Listing 1.02, entitled "[m]ajor dysfunction of a joint(s) due to any cause." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02. The ALJ commented that subsection A of that Listing requires "involvement of one major peripheral

weight-bearing joint (i.e. hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b," and paraphrased most of that section: "an impairment that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device that limits the functioning of both upper extremities." (A.R. 10.) The ALJ concluded that Pelka does not meet the definition of ineffective ambulation because she did not need crutches following her recovery from arthroscopic surgery and is "able to get around without assistance." (Id.) Because she did not meet the definition of ineffective ambulation in Section 1.00(B)(2)(b), the ALJ concluded that Pelka's impairments did not meet Listing 1.02. As the ALJ correctly pointed out, Pelka "must satisfy all criteria of a listed impairment" in order to qualify, *see Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999), and the inability to ambulate effectively is a requirement of Listing 1.02(A).

Pelka argues that the ALJ did not provide sufficient evidentiary support for his conclusion that she is able to ambulate effectively. She claims that the ALJ ignored her statement that she cannot walk on the uneven ground in her yard. (A.R. 153.) She also challenges whether the ALJ considered her practice of ascending the stairs in her home by sitting down on the steps and walking up if she has to ascend more than once a day. (Id. at 30.) She believes the ALJ ignored her testimony that she struggles with balance when her knee locks, and that she needs to stop, rest, and flex her leg after walking for five minutes. (Id. at 27, 29.) Lastly, she argues that the ALJ ignored her testimony about her experience

18

officiating at swim meets, where she decided that walking on the pool deck was too unsafe for her. (Id. at 25.)  She believes that this testimony shows that she meets some of the "examples of ineffective ambulation" in Section 1.00(B)(2)(b).  True, that Section includes a non-exhaustive list of examples including the "the inability to walk a block at a reasonable pace on rough or uneven surfaces" and "the inability to climb a few steps at a reasonable pace with the use of a single hand rail."  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b).  But Pelka bears the burden of proof here, *see* 20 C.F.R. § 404.1512(c); *Maggard*, 167 F.3d at 379, and the only evidence that she submitted in support of her claim of ineffective ambulation is her testimony—which the ALJ discounted because he found Pelka's complaints to be disproportionate to the evidence from the treating and examining physicians and to his own observation.  For the reasons discussed above, the ALJ's conclusion that Pelka overstated her symptoms is not patently wrong.

The ALJ provided an evidentiary basis for concluding that Pelka is capable of effective ambulation.  For example, the opinion notes, though not in the step-three analysis, the following: that Dr. Karri observed that Pelka "does not use any assistive devices to walk," has a "non-antalgic" gait, and was able to "walk 50 feet without support;" that Pelka told Dr. Wonais that she could walk for about 30 minutes, and he observed her walking on her heels and toes, and assessed normal range of motion of all major joints with hyperflexibility; and that Dr. Terry opined that she should be limited from certain activities but walking was not among them. (A.R. 11-12, 308, 310, 323, 359.)  All of this evidence

supports the ALJ's conclusion that Pelka does not meet the definition of ineffective ambulation of 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b).

In addition, the Seventh Circuit has held that in cases like Pelka's, where state agency doctors opine on Disability Determination and Transmittal forms that the claimant does not meet or equal a listing, the "ALJ may properly rely upon the opinion of these medical experts" without providing any more analysis. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). Here, Doctors Jimenez and Kenney both opined in Disability Determination and Transmittal forms that Pelka did not meet or equal a listed impairment. (A.R. 49, 50.) "These forms conclusively establish that 'consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence.'" *Scheck*, 357 F.3d at 700 (quoting *Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989)). Because Pelka's treating physician did not address the question of medical equivalency, it is "unnecessary for the ALJ to specifically articulate his reasons for accepting the consulting physicians' opinions on the question of medical equivalence." *Scheck*, 357 F.3d at 701.

Pelka's arguments that the ALJ erroneously failed to consider whether her reconstructive surgery met Listing 1.03, or whether the combination of her impairments are equivalent to Listing 1.02 or 1.03, or whether her obesity "increase[d] the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing," SSR 02-1p, 2002 WL 34686281 at *5, fail for the same reasons. "[T]he ALJ found that [the claimant] was obese and nothing suggests that he then disregarded that finding when evaluating whether her various medical conditions met the

severity of the listed impairments." *Sienkiewicz v. Barnhart,* 409 F.3d 798, 802 (7th Cir. 2005). Despite her obesity, she walked without a limp when she was examined by the state disability agency's examining physicians. (A.R. 308, 310, 323.) No doctor, not even Pelka's treating physician, opined that Pelka's obesity was aggravating her right knee injury or her ability to walk, even as they acknowledged her body size. (Id. at 309, 359.) Yet, to meet Listing 1.02 and 1.03, Pelka would have to demonstrate an inability to effectively ambulate as that term is defined by Section 1.00(B)(2)(b). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.02, 1.03. As discussed above, *Scheck* entitles the ALJ to rely on the unchallenged opinions of the state agency appointed physicians who reviewed the medical records and determined whether the claimant's impairments met or equaled a listed impairment. *See Scheck*, 357 F.3d at 700-01. And here, the state agency physicians relied on the medical records that acknowledged Pelka's obesity, yet they found that Pelka's impairments, individually and collectively, did not meet or equal either Listing. The ALJ's listing analysis is therefore supported by substantial evidence.

Pelka's remaining challenge to the ALJ's opinion regards the RFC analysis. Pelka's main argument here is that the ALJ did not conduct a functional analysis or provide a narrative discussion of Pelka's work-related capacities. As she points out, the Commissioner's rulings require the ALJ's RFC analysis to "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," and "include a narrative discussion describing how the evidence supports each conclusion." SSR 96-8p, 1996 WL 374184 at *1, 7. In her view, the RFC analysis fell

below this standard because it did not address Pelka's claims about her specific limitations, such as her right knee pain, her need to elevate and support her right knee, her struggles with reading in the afternoon, and pain, swelling, and throbbing in her right eye after exposure to bright lights, and the limits to the functioning of her right wrist. She suggests that the ALJ's RFC discussion was more akin to a summary of some of the medical evidence than an analysis of her ability to sustain the modified sedentary work that the ALJ concluded she could manage.

But here, the ALJ considered many of the factors listed in the Commissioner's regulations in determining Pelka's RFC, such as the objective medical evidence, the effects of treatment, reports of Pelka's daily activities, her attempts to work, and her own statements about her limitations. *See* SSR 96-8p, 1996 WL 374184 at *5. Pelka argues that the ALJ's consideration of the medical evidence was incomplete because he did not adequately analyze a post-surgical MRI of Pelka's knee from December 2008. But the ALJ is not required to analyze every piece of evidence before arriving at a well-founded conclusion, so long as the ALJ minimally articulates his reasons for crediting or discrediting evidence. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). Among the ALJ's fulsome discussion of the medical evidence, the ALJ included Dr. Terry's conclusion that Pelka had responded favorably to injections and physical therapy. (A.R. 11.) The ALJ also noted Dr. Karri's observations that Pelka is able to walk without any assistive devices, enjoys good grip strength in her right hand (4/5) and normal grip strength in the left (5/5). (Id.) He also considered Dr. Wonais's findings that Pelka's range of motion of all major joints was normal

22

including hyperflexibility, and that her corrected vision was nearly normal. (Id. at 11-12.) He observed that Pelka's "pain was relenting to such a degree that she only required conservative treatment." (Id. at 12.) The ALJ also looked into Pelka's daily activities, which he noted included light housework and shopping, both of which require more movement than the modified sedentary work he concluded she is capable of performing. (Id.) Lastly, the ALJ considered Pelka's attempts to officiate two NCAA swim meets despite her claimed pain. (Id. at 12.) Each of these observations shows how the ALJ considered Pelka's abilities before formulating her RFC, and each is a "dot" connecting the evidence to the ALJ's conclusion. *See Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (stating that the ALJ must "connect[] the dots between [the claimant's] impairments, supported by substantial evidence in the record, and the RFC finding").

The ALJ accounted for the limitations he found credible in the RFC. He accepted Dr. Terry's opinion that Pelka should avoid bending, squatting, and lifting because those movements would exacerbate her condition, and further limited Pelka from kneeling and crawling. (A.R. 359, 10.) The RFC accounts for Dr. Terry's limitation on lifting by precluding all but sedentary work, which requires little lifting. (See A.R. 10, citing 20 C.F.R. § 404.1567(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.")) And despite the ALJ's concerns about the credibility of Pelka's claims about her pain and limitations, the ALJ accounted for Pelka's knee pain by modifying the sedentary work to allow for a sit and stand option and further limited Pelka to only occasional stair climbing,

even though these limitations were not required by Dr. Terry. (A.R. 10.) This RFC is far more forgiving than those of Dr. Jimenez and Dr. Kenney, both of whom opined that Pelka is capable of standing or walking for about six hours in an eight hour workday, correlating with light work under SSR 83-10, 1983 WL 31251 at *5-6. (See A.R. 314, 325-27.) The ALJ's RFC analysis thus meets the standard of providing "an accurate and logical bridge between the evidence and the conclusion that the claimant is not disabled," *Craft*, 539 F.3d at 673 (internal quotation omitted), and is upheld here.

## Conclusion

For the foregoing reasons, Pelka's motion for summary judgment is denied, and the Commissioner's motion for summary judgment is granted.

**ENTER:**


**Young B. Kim**
**United States Magistrate Judge**